Alright well please call the next case for argument. Case number 19-2961 Eastern Arkansas, Lori Braun v. Brian Burke et al. Alright Mr. Clark we'll hear from you first. May it please the court, I'm Andy Clark and I represent Lori Braun as the Administrator of the estate of Cassandra Braun who was killed on October 10, 2016 at 9.30pm. Ms. Braun had recently moved to pursue her career from Florida to Arkansas when she was killed when the vehicle that she was riding in as a passenger was struck head on by an 45 mile an hour zone. Just five seconds before that Trooper Burke was traveling 113 miles in a 45 mile an hour zone and just seconds before that he was traveling 117 miles an hour in a 45 mile an hour zone. Trooper Burke, you know the first question that comes with these types of facts is what type of emergency would countenance such type of dangerous driving? Driving in violation of state law, driving in violation of the speed limits, driving in disregard to the rights of the motoring public. And the answer unfortunately in this case is there was no emergency. There was zero emergency. This was not a police pursuit of a suspected fleeing suspect. This was not an officer responding to a call for an assistance. These facts are undisputed. Trooper Burke was dispatched to a non-injury accident. He drove there without his lights and sirens. He went there. He stopped and met with somebody at the post office off of Highway 70. He was on that stop for about four minutes and during that time he walked around the  He observed a dark SUV pass by the location where he was that he believed was speeding. Trooper Burke believed the car was driving at 90 to 95 miles an hour, but this was unverified by any radar or any other type of active device that would check the speed. Trooper Burke only observed this vehicle for two to four seconds. All these actions are caught on tape for the court to review and in our brief we submitted a link to the videotape for the court's edification. Counsel, the trooper's affidavit does not use the word emergency, but it says that he was responding to a dangerous situation. So I guess I have two questions. First of all, does that dangerous situation equate to an emergency? And if it does, what evidence have you presented that would counter his subjective belief that he was responding to an emergency? Well, your honor, that's getting right to the meat of the coconut in here because the had to apply an intent to injure standard from Lewis v. Sacramento that had been applied in police pursuit case and emergency call cases, and that's why he dismissed the case finding no constitutional violation. What we have to do is we've got to remember, your honor, in both Terrell versus Larson and Sitz versus West Memphis, the court understood that we're not supposed to question an officer's understanding of whether a situation was an emergency unless the affidavit is preposterous or made in bad faith. In this case, Trooper Burke's affidavit is preposterous and in bad faith. First of all, number one, the district court didn't go through all the requests for admissions that were filed in this case, and in request for admission number 64, both Colonel Burke and Trooper Bryant admitted that he was not responding to an emergency call. The request is Trooper Burke was not responding to an emergency call during Burke's driving. They both admit it. Secondly, Trooper Burke was not involved in the immediate pursuit of an actual or suspected violator. Trooper Bryant and Colonel Bryant admitted that, Trooper Burke denied that, but the policy definition of pursuit is when an ASP officer in an official vehicle tries to stop a moving vehicle when the driver of such vehicle is aware of the officer is signaling the vehicle to stop and disregards the officer's attempt to stop the vehicle. In this case, Trooper Burke continued his traffic stop at the post office for an additional minute and 12 seconds after he observed the car. He then walked to his car, got into his car, did not call his dispatcher, which is required if you're driving in emergency mode, and he also testified that he was not involved in any type of pursuit. He said... Counsel, let me just interject there. I think you're correct to point out that there was no call here and also that there was no pursuit, but if it was an emergency, we still look to the subjective belief of the officer, and so I guess what I'm asking is, does his statement that it was a dangerous situation, does that equate to an emergency, and if so, did you put any evidence in to address his subjective belief? The answer to the question is, that affidavit came out after his deposition. He never talked about the dangerous situation throughout his deposition. He understood and he testified that a traffic offense is at the lowest end of the spectrum. It's not even a crime. It's a violation. This car was driving at what he suspected was 90 to 95 miles an hour, which begs the question altogether, what was he trying to do? At that speed, the vehicle would have been almost two miles away from him by the time he attempted to do that. The answer... Hold on, Mr. Clark. I thought there was evidence that he did catch up to the vehicle and that he had it in sight before the accident. Is that correct? Your Honor, that's his testimony. What we have is, he had traveled over eight miles at that point, and he says that he saw the vehicle right before the crash. I see. Okay. Thank you. Why wouldn't a vehicle driving at 90 miles an hour be dangerous? Well... Doesn't Clark... I mean, not Clark, your Clark, but I mean, the trooper's own conduct here shows how dangerous it can be when you drive that fast. Now, it may have been unwise to have two cars going that fast, chasing each other, obviously, but why isn't the 90 mile an hour passerby creating a dangerous situation for other people on the road, such that it should be apprehended, if possible? Well, when we look at official executive action, we look at what the danger to the public is versus in the benefit of the conduct. In this case, his conduct was expressly in violation of state law.  Is a car driving 90 miles an hour dangerous? I guess, if the court is willing, which I believe would be an error, to say that anytime anybody speeds, there could be some type of danger in here, but this is not the type of danger for which we allow officers to violate state law to engage in a eight mile, five speed car. I mean, this is the touchstone of arbitrary governmental activity. What we have is an officer who, in his zeal to enforce the law, violates the very law that he is contending creates the dangerous condition, and does it in such a manner as to illustrate an abuse of his discretion. This was not a decision that had to deal with competing elements, the need to catch somebody like Lewis said, like HealthSeth said, versus instantaneous response. This officer, solely based on his training, decided that it was appropriate to violate every traffic law that applies to him in his zeal to catch somebody who is solely suspected of violating a traffic law. Trooper Burke even acknowledged in his deposition testimony that had he caught up to a car, he would have to catch it speeding again before he could even pull it over, because he did not have any identifying information pertaining to the vehicle. If we allow an officer to basically, and what Terrell said and what Sith says, is we should not, we agree, this is from Sith versus West Memphis, we agree with the dissent that opinions should not be read to establish a rule that an officer can insulate himself from substantive due process liability no matter what the circumstances by simply averring he subjectively believed the situation to which he was responding was an emergency. And they go through some examples, driving 100 miles an hour through a children's race during recess time, driving the wrong way down a one-way street, and in those cases what the court said that those things would not be, those things would not be insulated by a self-serving affidavit. Let's also talk about his affidavit real quick. His affidavit is preposterous on its face. In paragraph seven of his affidavit, he notes that he saw a vehicle driving with his hazards lights, which is more warning to the public than Trooper Burke gave, and he said, I believe the SUV traveling at a high rate of speed with a likely untrained driver. How would an officer be able to make that thing based on a two to four second observation that the court itself can see on the videotape, which is blatantly false? So I believe that the officer's affidavit, there was no emergency that existed here. This is a cop abusing his authority as a law enforcement officer to drive in a reckless manner and complete disregard and conscious indifference to the rights of the motoring public, and it resulted in killing Ms. Braun. This case is governed by the deliberate indifference standard because there was no emergency. And even Colonel Bryant testified that Trooper Burke's conduct was, I want to get the correct site, was he did not use ordinary care. He went as far to say it was outside the scope of his duties. It was reckless. He did not drive with ordinary care and he drove with excessive speed. Trooper, Colonel Bryant actually said it could be shocking, the speeds that he was driving. Yes, sir, at page 143. My time is up, your honor. I'd like to save the remaining for rebuttal unless there's any questions. You may. Thank you for your argument, Mr. Clark. Mr. French, we'll hear from you first for, I believe, Burke. Mr. French, you may proceed. Mr. French, I'm sorry, your honor. May it please the court, my name is Matthew French and I represent former State Trooper Brian Ray Burke. We assert that the facts and law are fairly straightforward in this case and they support that the district court was correct in applying the intent to harm standard and holding that no constitutional violation occurred. And we ask this court to affirm that decision. Now the district court was correct in applying the intent to harm standard because Trooper Burke was faced with what he believed was a highly dangerous situation that required quick decisions and did not allow for actual deliberation. Counsel, in that regard, I thought the proper standard was emergency and yet you've switched it to dangerous situation. Yes, sir, your honor. What we see when we look at Terrell and the other cases that the Eighth Circuit has decided is that in Terrell, especially, there was a list of types of situations such as pursuits, prison riots, and emergency calls that the intent to harm standard would apply. What we argue is that the Eighth Circuit wasn't intending that to be an exhaustive or exclusive list and what we see in comparing the other situations in that whether or not the officer uses the label of emergency, the officer is responding to what he believes subjectively is a highly dangerous situation. And it requires him to respond. Counsel, we're already at odds with the Tenth Circuit and the Third Circuit. Are you asking us to expand it further or to encompass dangerous situations that are not emergencies? Well, I think that dangerous situations are analogous to emergencies. Usually, there is some sense that life may be in danger and I think that that is definitely true in this case. You have an SUV that is traveling down a dark two-lane highway going 90 to 95 miles an hour with a likely untrained driver. What I mean by untrained is that this driver does not have the same level of training that, say, Trooper Burke has, where he is trained to drive at high speeds as safe as possible at that speed. Trooper Burke recognized that in the moment and he had to make a decision quickly about whether he was going to just call for help and hope that another officer is able to relocate and stop this vehicle or whether he's going to try to catch up and stop it in the situation himself. What he did was he did both. He got in his vehicle and he took off in pursuit. He also called to the local sheriff's office. Their dispatch gave a report on the vehicle and which way it was heading towards the City of Potts Springs and told them to be on the lookout and try to stop it. Counsel, perhaps the key to this is to look and to see what was actually established by Burke's affidavit. What facts were established in that affidavit? Do they meet the definition of emergency under Terrell? I believe they do, Your Honor. So what exactly did he establish? Sure, Your Honor. What he established was that he saw an SUV 90 to 95 miles per hour, that the SUV had its hazards lights on, that the posted speed limit was 55, so the car was driving 35 to 40 miles per hour over the speed limit. That he believed that this high rate of speed was a dangerous and serious risk to the public and that he felt that he needed to stop it before something terrible happened. Now, of course, we know now in hindsight that something terrible happened as a result of Mr. Burke's decision, but of course we don't judge these situations with hindsight. So, Counsel, what I'm really getting at here is that I think under Terrell, he had to establish with his affidavits that his presence was needed as rapidly as he could arrive, and I'm not sure he established that, because that's the crux of it. Well, I think that he did, Your Honor. I think that we believe that he saw a very dangerous situation, a large SUV traveling nearly twice the speed limit, and that he needed to stop it. He also could, you know, most reasonable people look at a vehicle traveling fast with hazard lights to indicate that that person may have something wrong or even an emergency themselves. So, there is this impetus here that he needs to end whatever the situation is, even if it is to provide aid to the people in the SUV. What about the fact, though, that he waited a minute to actually begin the pursuit and then also didn't use his own emergency lights? Does that indicate that it maybe wasn't an emergency? Well, what we contend, Your Honor, is that he ended his stop as soon as he could. Sometimes in these situations, officers don't necessarily have a good sense of what the time is. He believed, and he testified that, that it was a much shorter amount of time. He didn't realize how long it had happened. Now, appellant's counsel likes to point out that he didn't run to his car, but he remained calm, as calm as he could, and he walked to his vehicle. Now, on his not using of lights and sirens, I think most officers and Trooper Burke himself would tell you that using lights and sirens when you're not pulling someone over can actually cause more problems than it solves because, as we've probably all seen, a lot of people act all kinds of ways when they see lights and sirens behind them. They can go all kinds of different directions, whereas in this case, and as you can see in the video, the dash cam video, Trooper Burke was, until the very end, of course, able to safely maneuver around all of the vehicles that were on the roadway up until, of course,  the accident. But I would also, I'm low on time, but I quickly just want to point out that even if this were a constitutional, even if you decide this is a constitutional violation, that Trooper Burke is still entitled to qualified immunity because it was not clearly established at the time under the law, which the Arkansas General Assembly has now amended in order to make it better understood that an officer can exceed the speed limit without lights and sirens in trying to catch up to a suspected violator. I think the court... Hold on, Mr. French. On that last point, you're saying it wasn't clearly established under state law that he was forbidden to use lights, but the real question is whether it was clearly established under the Constitution, right? Isn't that the way we have to look at it for qualified immunity? Yes, sir. And I would also say that it was not clearly established under constitutional means. The closest example to our case that Appellate has cited is Sowers v. Borough of Neskahonic in the Third Circuit that establishes something similar to our case is a constitutional violation. However, that was the first establishment of that, and that was in 2018, which was two years after this case occurred. So that case would not apply. Very well. Thank you for your argument. Thank you. Merritt, we'll hear from you. Thank you, Your Honor, and may it please the court. My name is Jennifer Merritt. I'm a Senior Assistant Attorney General with the Office of Arkansas Attorney General Leslie Rutledge, and I represent Separate Appellee Colonel Bill Bryant, who is the Director of the Arkansas State Police. There are four insurmountable hurdles to Ms. Braun's supervisory liability claims against Colonel Bryant, and this court should affirm the judgment of the district court in his favor. First, we believe that the district court did correctly apply the intent to harm standard. As this court held in Terrell v. Lawson, the intent to harm standard does apply in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation, not just high speed pursuits. Because there was such a situation here, we do believe that that was the correct standard, and so there's no basis to impose liability against the Colonel because he was only sued in his supervisory capacity. Second, Counsel, if this was actually a search for a suspect rather than a high speed chase in pursuit of a clean suspect, doesn't that change our analysis? I don't believe it does, Your Honor, because he was pursuing a suspect. He believed in the exercise of his professional judgment. He believed that this vehicle was traveling at excessive speed. He believed it was a dangerous situation. This was a dangerous situation. It precluded calm and reflective deliberation. He was traveling at excessive speed. So I do believe that that was the correct standard. But even if it wasn't, and even if the deliberate indifference standard was the correct one under Terrell, the trooper was still entitled to judgment as a matter of law because his conduct was not the kind of conduct that the court would find violated the 14th Amendment Substantive Due Process Clause. So even if the court were to find in this case that the district court incorrectly applied the intent to harm standard of Cameron of Sacramento versus Lewis, the court should still affirm because the trooper did not commit a constitutional violation even under that lesser culpability standard. Third, even if the trooper committed a due process violation, there is absolutely no basis in this record to impose supervisory liability on Colonel Bryant. There's nothing in this record that would show that Colonel Bryant was deliberately indifferent to a pattern and practice of constitutional violations by this trooper. And as a result, the colonel is entitled to qualified immunity, even if the trooper did violate the 14th Amendment. And finally, and this is the point that Braun has waived or abandoned by failing to discuss it in her appellate briefing, the official capacity claims that she asserted against Colonel Bryant and her complaint seeking both declaratory and injunctive relief are retrospective in nature under the court's ruling in the Justice Network versus Craighead County case. And those claims are therefore barred by the 11th Amendment. And for each of those four reasons, the state submits that the court should affirm the judgment in favor of Colonel Bryant in its entirety. We think that the crux of the matter with regard to the colonel is, of course, qualified immunity with respect to the supervisory liability claims. The court has explained that in order to be liable on a supervisory liability theory, a supervisor must know about a subordinate's unconstitutional conduct and either facilitate it, approve it, condone it, or turn a blind eye for fear of what he might see. And in this case, that did not happen. First of all, we contend there was absolutely no underlying constitutional violation by Burke, either under intent to harm or deliberate indifference. But again, I defeated that this was the first time that the trooper had had any kind of performance issue. There had never been any complaints about his conduct. There had never been any complaints about his driving. This was a trooper who, from the very beginning from troop school, had received excellent marks on his driving. He had received commendations on his job performance. He had never before been accused of any constitutional violations, let alone any violations with regard to his driving. And the case law in this circuit is uniform, that one constitutional violation. So even if the trooper committed a constitutional violation here with regard to this accident, one constitutional violation cannot, as a matter of law, form the basis of a supervisory liability claim against the colonel of the Arkansas State Police. There must be a pattern and practice of a constitutional violation by a subordinate, and then that supervisor must be deliberately indifferent to it. He must condone or turn a blind eye or approve it. And there's absolutely no facts in this record. There are a couple of cases that we discussed in the briefing, the Brossard v. Jank case, where the court held that a failure to train and supervise claim was without merit when it was undisputed that the tasings in that case involved tasings, but that was the first time that the officer had ever used a taser inappropriately. The court affirmed the dismissal of the supervisory claims in that case. There's another case, recent case, Perkins v. Hastings, where the city of Little Rock's police chief avoided liability, and in that case, the officer at issue had a very long and colored history of disciplinary problems, but yet the court found that because the chief did not have notice that his training and supervision were inadequate and likely to result in the officer's application of constitutionally excessive force that resulted in someone's dismissal in that particular case, the court found that the chief was not on the hook on a supervisor claim. And so in this case, this trooper had never had any kind of disciplinary issues, never even a complaint against him. There was nothing to put Colonel Bryant on notice that there was a need to train Colonel Bryant, or excuse me, a need to train the trooper or a need to supervise him more. And in fact, all of the evidence in this case points the complete opposite direction. It is undisputed in this case that Colonel Bryant, when he became the director of the Arkansas State Police, he went in and he increased the training that was provided to all troopers, including Trooper Burke. He instituted annual in-service training. He specifically and personally trained all troopers, including Trooper Burke, that they need to use their emergency equipment, including their blue lights and their sirens, anytime they exceeded the speed limit. Anytime they were pursuing. That was undisputed. Very well. I think your time has expired, but we thank you for your argument. And we'll hear from Mr. Clark and Roboto. Thank you, Your Honor. It's important to know the posture how this case is presented to the Court of Appeals. The district court only found, only ruled on the first issue that there was no constitutional violation. It didn't get to the second portion of the qualified immunity that clearly established law. It also basically, because there was no constitutional violation, dismissed all the claims against Colonel Bryant based on a finding of no underlying constitutional violation. The record is replete with an affidavit from our expert that's 43 pages. Dr. Jeff Alford, who goes through the training and the policies and the previous OPS investigations that basically ended up with this. Here's the situation that we have is Colonel Bryant allowed an illegal catch-up policy that allowed his officers to violate state law while they prosecuted, while they drove their vehicles. What I'm asking the court to do is to provide a ruling on this issue for clarity and then remand it back to the trial court to address the issues that have not been addressed by the trial court. And this is what I think the standard is. In response to your question, Judge Gross, here's what I think. Engaging in a high-speed pursuit on public highways at speeds of over 100 miles per hour threatens all those within the range of the pursuit, be they suspect, passengers, other drivers, or bystanders. Every police officer understands that risk. That's why we expect our law enforcement personnel to engage in such pursuits only when there is reasonable justification. Responding to a true emergency may be reasonable justification. Pursuing an actively fleeing suspect who is endangering the public welfare may also be reasonable justification. But attempting to catch someone who has committed a minor traffic offense, especially when other law enforcement officers have been alerted to stop the offender, is not reasonable justification for driving carelessly at speeds in excess of 100 miles per hour. These decisions are not made in haste. They're not split second. And Trooper Burke basically engaged in an illegal joyride. And I appreciate it, Your Honor, if they have no more questions. Very well.